# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1324

_____

| | | |
|---|---|---|
| Rameau A. Johnson; Phyllis A. Johnson; | * | |
| Thomas R. Herring; Karon S. Herring; | * | |
| DFM Investment Company; David F. | * | |
| Mungenast; and Barbara J. Mungenast, | * | |
| | * | |
| Appellants, | * | On Appeal from the |
| | * | United States Tax Court. |
| v. | * | |
| | * | |
| | * | |
| Commissioner of Internal Revenue, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 19, 1999

Filed: July 21, 1999

_____

Before RICHARD S. ARNOLD and WOLLMAN,[1] Circuit Judges, and MAGNUSON,[2] District Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

_____

[1]The Hon. Roger L. Wollman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 24, 1999.

[2]The Hon. Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

This case involves the appropriate method of accounting for income received on the sale of vehicle service contracts (VSCs) by four motor-vehicle dealerships. We will summarize such of the undisputed facts as are necessary to an understanding of the issue. When a car is sold, the dealerships also offer for sale a VSC. This is a kind of warranty agreement, under which the dealership grants to the buyer the right to have parts or components covered by the VSC repaired or replaced, whenever the covered parts experience a mechanical breakdown.

Under the VSC, the car dealer agreed either to repair or replace covered parts itself, or to reimburse the car buyer for the reasonable cost of repair or replacement. Normally, the buyer would return the vehicle to the dealer for repair, but the buyer could also elect to have repairs made elsewhere, by other qualified facilities. In either case, the repairs or replacements had to be authorized in advance by an Administrator employed by the dealership to oversee the arrangement. The program was administered for a time by Mechanical Breakdown Protection, Inc. (MBP), and thereafter by Automotive Professionals, Inc. (API).

A buyer could cancel a VSC at any time. If he or she did so, a portion of the payment for the VSC, computed on the basis either of time elapsed or miles traveled, would be returned to the buyer.

The proceeds of the sale of VSCs were distributed in the following manner: all of the money would be initially paid to the dealership, the taxpayer. Some of it the dealership would retain, and the taxability of this portion of the sale proceeds is not at issue in this case. The taxpayers concede that this portion of the price paid for the VSCs is properly includible in income for the year of the sale of the car. The rest of the money received for a VSC would be paid into an escrow account. According to a contract between the taxpayer-dealership and the buyer of the car, this escrow account was known as "the Primary Loss Reserve Fund" (PLRF). The purpose of this fund was to secure the performance of the taxpayer's obligations under the VSCs. The fund

would be administered by the Administrator, and investment income accrued on the fund would itself be deposited in the fund. When authorized repairs or replacements were performed by a taxpayer-dealership, it would receive, from the PLRF, the agreed-upon price for this work. If authorized repairs or replacements were performed by another facility, this facility would receive payment from the fund, thus discharging the obligation of the dealership to cause the appropriate repairs or replacements to be made. At the termination of a VSC, the unconsumed reserves attributable to that particular contract would, in the ordinary course, be returned to the dealership. The accrued investment income attributable to the expired contract would also go to the dealership, except that, under the MBP program, the Administrator was entitled to keep the investment income attributable to any unconsumed reserves. The right of the dealership to receive unconsumed reserves was subject to certain conditions.

The dealerships bought insurance for the VSC program from Travelers Insurance Company. Travelers issued an automobile dealers service contract excess insurance policy, under which it agreed to indemnify the dealerships for covered losses exceeding the aggregate amount of PLRF reserves on all VSCs.

The dealerships also paid a fee to the Administrator, and this fee would be paid immediately upon the receipt by the dealership of the price for a VSC.

The main question involved in this case is whether amounts received by the dealership for VSCs, and then turned over at once by the dealership to the escrow fund, or PLRF, in accordance with the contract between the dealership and the buyer of the car, are properly includible in gross income for federal income tax purposes in the year of the sale of the car. As the taxpayers see it, they should have to pay tax only when services are performed, and payment for those services is made from the PLRF. The Internal Revenue Service, on the other hand, contends that the taxpayers should have recognized the income during the year of the sale of the car, the year in which money was paid to the dealerships and then turned over by them to the PLRF. Under the

government's view, the dealerships would be allowed to deduct any money returned to buyers on their election to cancel a VSC. This deduction would occur in the year that payment pursuant to the cancellation was made. In addition, any money released to the Administrator upon expiration of a contract would be deductible by the dealership in the year of release.

So the question concerns, at least in the main, not whether payments received by the taxpayers were taxable, but, rather, <u>when</u> they were taxable. Questions are also presented with respect to the tax treatment of investment income on funds already in the PLRF, and with respect to the timing of a deduction for fees paid to the Administrator.

The Tax Court agreed with the position of the Revenue Service. <u>Rameau A. Johnson</u>, 108 T.C. 448 (1997). Taxpayers appeal. In the main, we affirm. The arguments and authorities are thoroughly discussed in the Tax Court's detailed opinion, and we see no need to re-plow that ground. Instead, we summarize our conclusions as follows:

1.      With respect to the main issue, we agree with the Tax Court that money received by the taxpayers upon sale of the VSCs, and immediately paid over into the escrow account in accordance with the contract between the taxpayers and the buyers of the cars, is includible in income for the year of receipt. Taxpayers' position, that the income should be recognized only at such later time as they in fact receive money when repairs on the cars are performed, is plausible and certainly not irrational. The Commissioner of Internal Revenue, however, has broad powers to determine whether the accounting method used by a taxpayer clearly reflects income. See, <u>e.g.</u>, <u>Commissioner v. Hansen</u>, 360 U.S. 446 (1959). That a certain method of accounting meets generally accepted commercial accounting principles does not necessarily mean that the Commissioner must accept it for income-tax purposes. Nor, even in the case of accrual-basis taxpayers, such as those in the present case, is it invariably proper to

defer the recognition of income until the taxpayer performs those acts which are necessary to earn it. It is the right to receive the income, and not necessarily its actual receipt, that is controlling for tax purposes. Here, we hold that the Commissioner did not exceed his broad powers when he determined that the method of accounting used by the taxpayer – deferring recognition of the income until repairs were performed, or other events took place that would result in payment of money to the taxpayer out of the escrow fund – did not clearly reflect income.

The ledger will be corrected, so to speak, in future years, when the taxpayers will be allowed to take deductions for money paid out of the escrow fund to other persons (for example, to the car buyers on the exercise of their option to cancel the VSCs). And we shall have more to say about deductions later in this opinion.

Taxpayers point out that the VSCs permit car owners to have their vehicles repaired at other facilities. Repairs need not necessarily occur at the taxpayers' own facilities. It is still true, however, that the VSCs require the taxpayers to cause the appropriate repairs to be done, whether by themselves or by other persons. Accordingly, when money is paid from the escrow fund to other repair facilities, this money is used to discharge an obligation of the taxpayers, and is treated for tax purposes exactly the same as money that goes to the taxpayers directly. In either case, taxpayers have a fixed right to receive the money, and the right is established with sufficient certainty in the year that the VSCs are sold. For a fuller explication of the point, we refer the reader to the opinion of the Tax Court.

2.    The second point at issue on the appeal concerns money earned by investing the escrowed amounts. The Tax Court held that this investment income is also to be included in the taxpayers' income, in whatever year the investment earnings take place. We agree. The hair should follow the hide. The escrowed amounts are held for the benefit of the taxpayers, either for payment directly to them or for discharge of their obligations under the VSCs. Money earned by these amounts should

-5-

follow the same path for tax purposes. As we have noted, however, the escrow account was administered, during successive periods of time, by two separate administrators. As the government's brief concedes, "[u]nder the MBP program, . . . the Administrator was entitled to accrued investment income attributable" to unconsumed reserves in the escrow fund. Brief for Appellee 4 n.7. We are not certain what view the Tax Court took of this species of accrued investment income. The taxpayers never had, and would never achieve, a right to these particular funds. They belonged unconditionally to MBP. Accordingly, it would not be appropriate for this sort of investment income to be taxed to the taxpayers. On remand, the Tax Court should modify its judgment to take this point into account, if necessary.

3.      The other aspect of the appeal on which we deem it appropriate to comment concerns claimed deductions. When VSCs were sold, a portion of the sales proceeds, as we have noted, was paid into an escrow fund. Some of this portion was then paid to the Administrator, either MBP or API as a fee for administrative services. Taxpayers claim a deduction, in the year of payment, for the amounts paid over as fees in this manner. The Tax Court rejected the claim, holding instead that no deduction would be allowed until the years in which services were actually performed. We think this was error. If taxpayers are going to be required to take into income the entire amount paid into the escrow fund in the year of receipt and payment, we think, as a matter of fairness, that they should also be allowed to deduct, in that year, the entire amount of the fee paid to the Administrator. Just as taxpayers, in effect, are selling a service warranty to the buyers of cars, and assuming, in the year of sale, the entire risk attendant on such warranty, the Administrator is selling to the taxpayers its undertaking to administer the fund with respect to the particular VSCs sold in a given year. In addition, the Administrator immediately performs substantial services, including supplying promotional materials and forms necessary to implement the contract. To be sure, the Administrator would later do other work, but its undertaking to do this work was unconditional. It is not fair to require the taxpayers to recognize as income

all of the money paid into the escrow fund, while denying them a deduction for amounts actually paid out of that fund in the same year.

In so holding, we mean to establish no general rule. We hold only that what is sauce for the goose is sauce for the gander. In the tax year in which the fees are paid to the Administrator, all events have occurred that establish liability for that payment, and the amount of the liability can be determined with reasonable accuracy. The Commissioner argues that economic performance has not yet occurred with respect to the liability, because the services in connection with which the Administrator must incur costs have not yet all been performed. See Treas. Reg. § 1.461-4(d)(4)(i). While this is certainly true in the abstract, the question in this case is whether the method of accounting proposed by the Commissioner clearly reflects income. To answer that question both income and deductions must be considered. If the income is to be recognized, and we have upheld the Commissioner's decision on that point, the deduction associated directly with it should also be recognized.

For the reasons given in this opinion, the judgment appealed from is affirmed in part and reversed in part, and the cause is remanded to the United States Tax Court with instructions to enter judgment consistent with this opinion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-7-